## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| **RESSLER HARDWOODS AND** | * | **CHAPTER 7** |
| **FLOORING, INC.,** | * | |
| Debtor | * | |
| | * | **CASE NO. 1:08-bk-01878MDF** |
| **JAMES LITTLE,** | * | |
| Plaintiff | * | |
| | * | |
| v. | * | **ADV. NO. 1:08-ap-00109** |
| | * | |
| **RESSLER HARDWOODS AND** | * | |
| **FLOORING, INC.; KEITH RESSLER;** | * | |
| **KENNETH L. RESSLER; KAREN R.** | * | |
| **RESSLER,** | * | |
| Defendants | * | |

## OPINION

### I. Background

During the time relevant to this case, Ressler Hardwoods and Flooring, Inc. ("Debtor")

was a flooring manufacturer owned and operated by Defendants Kenneth and Karen Ressler and

their son Keith Ressler (collectively "the Resslers;" individually "Keith," "Kenneth," and

"Karen").[1]  James Little ("Little") was an experienced investor employed by a commodity trading

firm in Baltimore, Maryland.  Little also held a controlling interest in Epic Floors, Inc. ("Epic"),

one of Debtor's customers, which was managed by his daughter, Nicole Little ("Nicole").

Between 2004 and 2006, a series of unfortunate events occurred that had a profound

negative impact on Debtor's profitability.  During this period, Debtor relocated its business

twice. After the second relocation, Debtor's production facility was severely damaged by fire.

---

[1]On January 26, 2010, Debtor's chapter 11 case was converted to one under chapter 7.  A
trustee has been appointed to administer the estate of the now-defunct corporate entity.

Each of these events disrupted Debtor's operations for several months. Even after production resumed, Debtor had difficulty fulfilling orders because of inadequate financing.

Little learned that the Resslers were looking for an investor, and the parties began negotiations for Little to acquire 51% of Debtor's stock for $1.2 million. The parties agreed that Debtor would retain the Resslers as the business' managers, therefore operating and employment agreements had to be negotiated before the sale of the stock could be finalized. During the negotiation process, Little advanced $400,000.00 to Debtor to address its immediate liquidity needs.

Unfortunately, in the late summer and early fall of 2007, the parties' efforts to negotiate employment and operating agreements stalled, and then ultimately failed, prompting Little to demand the return of the $400,000.00 he had advanced to the company. Debtor lacked the funds necessary to refund Little's money and, instead, decided to treat Little's cash advances as a partial payment on Little's purchase of Debtor's securities. Accordingly, Debtor issued to Little a stock certificate representing 26,021 shares (17%) of the company and pledged to issue the remaining shares (34%) when the balance of the purchase price was paid. Little refused to accept the shares issued and to pay the balance claimed by Debtor. Little did offer to return the shares issued to him in exchange for the $400,000.00 previously paid, plus interest, which was rejected by Debtor.

On January 15, 2008, Little filed a lawsuit against Debtor and the Resslers in the United States District Court for the District of Maryland (the "Maryland District Court") to recover the funds advanced. The three-count complaint alleged two counts of violations of the Maryland Securities Act ("MSA"), Md. Code Ann., Corps. & Assns. § 11-501 et seq., and one count in

common law assumpsit. On May 27, 2008, Debtor filed the instant bankruptcy case. By order dated July 14, 2008, the Maryland District Court transferred Little's lawsuit to the Bankruptcy Court for the Middle District of Pennsylvania. This Opinion will address the merits of Little's case under the MSA.

## II. Jurisdiction

I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(L). This Opinion and Order constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

On March 31, 2009, I issued an Opinion on a motion for summary judgment filed by Debtor and the Resslers on two of the three counts in Little's complaint. By Order dated July 2, 2009, Count One of the complaint was dismissed as against all Defendants.[2] The trial on the remaining counts took place on July 1 and 2, 2009.[3] On January 22, 2010, I issued an Order allowing the parties seven days to indicate whether or not they would consent to my entering a final order on the merits. Consents were filed by all parties.

---

[2]Because each Count of the Complaint raised a non-core matter, the Court was required under 28 U.S.C. § 157(c)(1) to submit proposed findings of fact and conclusions of law for *de novo* review by the District Court unless the parties consented to this Court's entry of a final order on the summary judgment motion. The lapse of time between docketing of the Opinion and the subsequent Order was due to the need for Little and the Resslers to decide whether or not to consent to the Court's jurisdiction to enter a final order on summary judgment. All necessary consents were filed or verbally entered on the record as of July 1, 2009.

[3]For ease of reference, the notes of testimony will be referenced by the letters "N.T." preceded by the date of the testimony (e.g. "7/1") and followed by a page number. Exhibits will be referenced by the number marked at the trial. If available from the exhibit, the "Bates number" from a specific page(s) will also be provided in the reference.

3

The parties filed briefs on September 22 and October 7, 2009. Little's brief does not address the third count of the complaint, which was based on common law assumpsit. Therefore it is appropriate to treat that theory of recovery as having been abandoned. Accordingly, this Opinion need only address the second count, which alleges fraud or deceit in the sale of a security under the Maryland Securities Act ("MSA"), Md. Code Ann., Corps. & Ass'ns § 11-703.

### III.  Factual Findings[4]

Debtor's principal place of business is located at 29 Keystone Drive, Lebanon, Pennsylvania.  (Little Ex. 21, Bates No. 757.)  Defendants Keith, Kenneth and Karen Ressler were, respectively, Debtor's president, vice-president and secretary, and together they held 100% of Debtor's stock.

Prior to his retirement in January 2009, Little was employed as Vice President and Director of Business Development for Campbell & Company, a commodities trading advisor in Baltimore, Maryland.  He is now retired and resides in Florida.  In 2005 and 2006, Little's individual income exceeded $200,000.00 per year and his net worth exceeded $1 million.

Debtor was incorporated under the laws of Pennsylvania in February 1994 and began its operations from a location in Lititz, Pennsylvania.  In 2004, Debtor moved its plant to Baltimore, which interrupted production for approximately five months.  Unfortunately, the Baltimore operation was not successful and was closed in 2005.  Debtor then returned to Pennsylvania, but this second move interrupted operations for another lengthy period – this time for six months.

---

[4]Some of the Factual Findings are taken from my Opinion on the motion for summary judgment.  For clarity, these findings will be repeated here rather than incorporated by reference.

4

In preparation for its move back to Pennsylvania, Debtor obtained a new facility in Lebanon County that was much larger than its original plant. Before operations could be resumed, in March or April 2006, fire broke out, delaying the reopening of the business until August 2006. In November 2006, Debtor again had to shut down, this time because of a roof collapse attributed to fire damage. For various reasons not relevant here, Debtor did not receive immediate payment from its insurance carrier after the fire. By early 2007, Debtor finally was settled in a new and expanded facility with state-of-the-art equipment. However, Debtor's operations continued to experience significant problems because Debtor lacked the funds needed to purchase raw lumber to fill flooring orders. To meet this need, Debtor's principals began to look for an investor to provide an immediate capital infusion.

Having learned of Debtor's cash flow problems, Nicole introduced her father to the Resslers as a possible investor who could provide Debtor with the liquidity needed to fund its operations. Little, for his part, was looking for a business opportunity that would provide him with a stream of income for his retirement. On a weekend shortly after the parties' first meeting, Little, accompanied by his wife and his accountant, visited Debtor's physical plant to observe its operations. Thereafter, Keith met with Little in Maryland on two or three occasions to discuss Little's possible investment in the company. Kenneth was included in one of these meetings, but Keith was the point person for the negotiations with Little. Eventually, the discussions culminated in a verbal agreement that Little would purchase 51% of Debtor's stock for $1.2 million if the parties could reach mutually acceptable terms. Although the sale would require the Resslers to relinquish control of the corporation, Little agreed that the former owners would be retained to manage the business. Therefore, before the sale could be consummated, employment

5

and operating agreements satisfactory to all parties had to be negotiated. The parties and their agents began negotiating these agreements in the spring of 2007 with discussions continuing into the fall of that year.

When negotiations commenced, Little generally understood that Debtor was experiencing financial difficulties and needed an outside investor. Little acknowledged at trial that he knew "that they were struggling somewhat financially because that's one of the reasons that people look for an investor, and that's typically when an investor can buy a company at a reasonable price." (7/1 N.T. 236.) Little was aware of many of the events that had plagued Debtor's business. He knew that Debtor had moved its physical plant from Lititz to Baltimore and back to Lebanon County, Pennsylvania between 2004 and 2006, resulting in lengthy interruptions to production. He also knew that Debtor had incurred unreimbursed losses and suffered disruption to its business from a fire at its new facility. He was aware that Debtor was in litigation with its insurance provider regarding the proceeds that Debtor would receive under its business interruption coverage. In July 2007, Little knew that Debtor did not have sufficient income to purchase raw materials to meet customer orders, that the company needed funds to purchase those materials, and that Debtor wanted Little to provide this funding in the form of cash. Keith and Kenneth had estimated that Debtor's overall cash needs to get it "over the hump" were approximately $1.2 million. They had also informed Little that Sovereign Bank ("Sovereign") was pressuring Debtor regarding payments on a secured loan.[5]

---

[5]Little testified that he "took [it] with a grain of salt" when informed that Sovereign was "pressing [Debtor] for payment" because "if you're slow in payments, any bank is going to be breathing down your neck." (7/1 N.T. 185.)

6

At a meeting in Hunt Valley, Maryland on March 7, 2007, Keith provided Little with a memo on the subject of "Investment Into Ressler Hardwoods and Flooring, Inc." that was silent about Debtor's current financial condition, but was optimistic in its outlook for Debtor's profitability in 2007.[6] The memo described business quoted to potential customers; the status of current orders, including the profit margin expected to be earned; and a specific projection of gross income of $325,000.00 per month in 2007.

At a conference held on June 28, 2007, Little asked for, and Keith agreed to produce, Debtor's financial statements, to provide Little with details of its monthly cash flow. On July 6, 2007, Keith contacted Little by phone requesting an advance of $200,000.00 toward the purchase of Debtor's stock. Although Keith had not yet produced the requested financial information, Little agreed to advance the $200,000.00 and asked Keith to draft a letter for his signature. The letter, executed by Little and dated July 6, 2007 (hereinafter "the July 6 Letter"), stated in part that it was intended "to serve as our written intent to complete the investment transaction."

---

[6]Keith's memo made the following representations regarding sales for 2007:

1. We have been quoting an average of 1 to 2 million in quotes per month for Distributors[.]
2. From our retail facility quotes average from 150 [sic] to $200,000 per month[.]
3. Quotes for March are already at $1.3 million[.]
4. Our current back log [sic] is $473,000 (77,000 sf) with a margin of 10%[.]
5. Starting in April we have 2 more Distributors who will be stocking our material and purchasing a combined amount of $220,000 per month[.]
6. We have a job for 200,000 sf of Walnut for the next 1 ½ years with it front loaded to start producing in April. Estimate for this order would be 150,000 this year which would add another $75,000 per month to give us a steady order base of $295,000 per month[.]
7. Our projection for 2007 is $325,000 per month[.]
8. Assumption is that we will exceed our projection[.]
9. Currently milling for Armstrong[.]

(Debtor Ex. 3, Bates No. 10.)

7

(Little Ex. 6.) It further stated that Little's check for $200,000.00 "represent[ed] a down-payment towards the purchase price." In a July 24, 2007 email, Keith acknowledged receipt of the check and represented that Debtor had used the funds to purchase "a lot of loads of lumber to fill our customers (sic) orders [and] to get current with our lease payments. . . ." (Little Ex. 8). In the same email, Keith asked Little to advance another $200,000.00 to get Debtor through the next thirty days until the payments from customers started to come in. Little immediately responded with a check in the requested amount. Karen endorsed the check on Debtor's behalf and deposited it into Debtor's bank account.

While a formal stock purchase agreement was being drafted, the parties and their legal and financial representatives discussed the terms for various agreements ancillary to the stock purchase. The record does not provide many details about these negotiations, but it appears that progress was slow and that both sides blame the other for the delay. The delay in finalizing the sale was especially problematic for Debtor because of pressure being exerted by Sovereign.[7] On October 1, 2007, Debtor's attorney, Jacques Geisenberger ("Geisenberger"), faxed a letter to Little's counsel, Bruce Kauffman ("Kauffman"), referencing Little's payments totaling $400,000.00 as a "partial payment of a $1,200,000.00 written unconditional commitment to acquire 51% of [Debtor's] common stock." The letter stated that "on and after (sic) 5:00 p.m. on Monday, October 8, 2007, [Debtor] will immediately place on its books Little's letter [the July 6 Letter] as a Stock Subscription in the amount of $1,200,000.00, credit the $400,000.00 Little

---

[7]Details regarding the manner and degree of Sovereign's pressuring were not provided for the record by the Defendants, but Little does not dispute that it existed.

8

previously paid, and reflect Little's $800,000.00 unpaid balance as a Stock Subscription Receivable." (Little Ex. 17.)

Kauffman apparently responded to this letter by calling Geisenberger and setting up a telephone conference, which was held on October 15, 2007 and attended by the parties and their attorneys and accountants. Topics of discussion included distribution of corporate income among the shareholders, capitalization of certain loans previously made by the Resslers to the company, transfer of stock among the various shareholders and their heirs, termination of Keith's employment for cause, and the salary amounts to be paid to the Resslers. On October 16, 2007, Debtor's financial advisor, Francis Musso ("Musso"), wrote a memorandum containing "summary notes and assignments" from this conference, which he emailed to all conference participants on October 17. (Debtor Ex. 26.) Musso received no responses to his email either confirming or challenging his summary of the meeting.

Little was scheduled to be in Israel during most of November 2007. Debtor's principals believed that foreclosure by Sovereign was imminent, and they sought to finalize the deal with Little before his departure. Musso's notes of the October 15 conference state that "[t]he bank and 4 (sic) vendors are closing in on the corporation. Little is going to Israel on Friday, November 2, 2007. All documents must be completed by that time." (Debtor's Ex. 26.) Musso drafted an "Interim Agreement" (Little Ex. 22) that was sent to Little at some point after the October 15 meeting. This Interim Agreement was, by its terms, to be replaced by final agreements. On November 2, 2009, Little sent an email to his accountant, Scott Anderson ("Anderson"), expressing his displeasure with inconsistencies between the Interim Agreement and Little's understanding of the terms reached at the October 15 meeting. Neither Little nor any

other party executed the Interim Agreement. Ultimately, Little departed for Israel after placing $800,000.00 in escrow for settlement if a final agreement were reached before his return. While in Israel Little received faxes from Kauffman regarding the deal, but he otherwise was not involved directly in the continuing negotiations. A series of emails between Geisenberger, Musso and Kaufman indicate that while Little was out of the country drafts of a "Buy-Sell Agreement," "Stock Pledge Agreement" and "Executive Employment Agreement" were exchanged, but no final agreements were reached on any issue. (Little Exs. 26 - 28.)

Once he returned to the United States, Little telephoned Keith to discuss the status of the negotiations. Keith flatly refused to engage in any substantive discussion with him because of a confidentiality agreement he had signed with another potential purchaser. Angered by Keith's rebuff and seeing no reason to proceed with negotiations, Little withdrew his offer to purchase the shares and demanded the return of the $400,000.00 he had advanced.

On November 28, 2007, Geisenberger faxed a letter to Kauffman demanding that Little immediately pay an additional $400,000.00 toward the purchase price of the securities so that Debtor could obtain an extension on loan payments. (Little Ex. 29.) Kauffman apparently did not respond directly to this correspondence, but on December 6, 2007, he sent a letter to Geisenberger demanding the immediate return of the amounts previously paid, plus interest at the Maryland statutory rate. (Little Ex. 31.)

In response to Kauffman's letter, at a meeting of Debtor's board of directors held on December 10, 2007, the Resslers voted unanimously to issue 26,021 shares of stock to Little, with "Little's stock subscription of July 2007 . . . remain[ing] open until July 1, 2008 to purchase the balance. . . ." (Little Ex. 32.) Karen signed the minutes of the meeting as Debtor's

10

secretary. A certificate for 26,021 shares was sent to Little by Geisenberger with a letter dated December 11. (Little Ex. 33.) On December 19, Kauffman responded on Little's behalf with another letter to Geisenberger demanding the return of Little's money. The letter stated that Debtor's "effort to apply [the] $400,000.00 to a purchase of 17% of the common stock of Ressler is contrary to the securities laws of the State of Maryland. . . . [Therefore] Little is prepared to tender back to [Debtor] all 26,021 shares . . . provided that [Debtor] returns the $400,000.00 plus interest at the Maryland statutory rate." (Little Ex. 35.) Debtor did not respond.

On January 15, 2008, Little filed the instant lawsuit in the Maryland District Court. On January 29, 2008, the Resslers convened a board of directors' meeting to discuss the board's response to the lawsuit. At this meeting, Keith produced a letter signed by him, addressed to "Jim" [Little] and bearing a date of July 24, 2007. The body of the letter comprises two sentences, reading as follows:

> This letter is to serve as an acknowledgment that the two advances of funds by Jim Little to Ressler Hardwoods & Flooring, Inc. in the aggregate amount of $400,000 is [sic] a loan to the company. The loan amount will be rolled into the equity purchase transaction upon the completion and execution of the Purchase Agreement by both parties.

Little disputes the letter's authenticity and denies that he ever agreed to re-characterize the funds advanced as a loan. When Keith first produced the letter after the instant complaint was filed, he did not recall having written it, but at trial he averred that he found the original while reviewing his files in preparation for the January 29, 2008 meeting.

On May 27, 2008, Debtor filed its chapter 11 bankruptcy petition. In its schedules Debtor reported that Little held an unsecured claim based upon a "loan" of $400,000.00.

# IV. Discussion

Count Two of the complaint is based on the MSA, which governs the sale of securities in the state of Maryland. Section 11-703(a)(1)(ii) provides that:

> A person is civilly liable to the person buying a security from him if he:
> . . . .
> (ii) Offers or sells the security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and if he does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

MD Code Ann., Corps. & Ass'ns, § 11-703(a)(1)(ii). The term "person" as used in § 11-101(n) of the MSA includes both an individual and a corporation. Civil liability under § 11-703(a)(1)(ii) is extended to officers and directors of a seller corporation under the following provision:

> Every person who directly or indirectly controls a person liable under subsection (a) of this section, every partner, officer, or director of the person liable, . . . are also liable jointly and severally with and to the same extent as the person liable, unless able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

MD Code Ann., Corps. & Ass'ns § 11-703(c).

Unfortunately, there is "a dearth" of published opinions from Maryland state courts addressing civil liability under § 11-703. *Sherwood Brands, Inc. v. Levie*, 2006 WL 827371, *12 (D. Md.). However, there are two sources that a court may use to assist in construing these provisions. Section 11-703(a)(1)(ii) of the MSA is based upon § 410 of the Uniform Securities Act of 1956 ("USA") promulgated by the Conference of Commissioners on Uniform State Laws. *See* Md. Code, Corps. & Ass'ns. § 11-703, historical and statutory notes; Uniform Securities Act

12

(1956 amended 1958), 7C U.L.A. Appendix I 746 (2006). The USA was drafted as a model for state regulation of securities offerings and was intended to "make for an interchangeability of federal and state judicial precedence in this very important area." Louis Loss & Edward W. Cowett, *Blue Sky Law,* 391 (Little, Brown & Co. 1958). Therefore, cases construing the securities laws of other states that also have incorporated the civil liabilities provision of the USA are persuasive.

Section 410(a)(2) of the USA provides that:

> [a]ny person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him. . . .

Unif. Sec. Act (1956) § 410(a)(2).

Both the MSA and the USA provide that a person who offers or sells a security and makes an untrue statement of material fact or omits a material fact necessary to make the statement made not misleading is civilly liable if the purchaser does not know of the untruth or the omission. The person selling the security is not liable, however, if he can prove that he did not know of the untruth or the omission and could not have known of the untruth or omission in the exercise of reasonable care.[8]

_____

[8]As I discuss later in this Opinion in the section on Defendants' affirmative defenses, I reject Defendants' argument that the MSA places the burden on the purchaser to prove that the seller knew or should have known that the statement at issue was untrue or that information was omitted that would have made other statements made not misleading.

13

Courts interpreting state statutes modeled on the USA agree that securities laws are to be interpreted broadly to protect the potential securities purchaser. *See People v. Cole*, 156 Cal. App. 4th 452 (2007); *Kinney v. Cook*, 159 Wash 2d 837, 154 P. 3d 206 (2007); *Fed. Mgt. Co. v. Coopers & Lybrand*, 137 Ohio App. 3d 366, 738 N.E. 2d 842 (2000); *Aste v. Metropolitan Life Ins. Co.*, 312 Ill. App. 3d, 728 N.E. 2d 629 (2000); *Marshall v. Harris*, 276 Or. 447, 555 P.2d 756 (1976); *Jaciewicki v. Gordarl Associates, Inc.*, 132 Ga. App. 888, 209 S.E. 2d 693 (1974); *Com. ex rel. Pennsylvania Securities Commission v. Consumers Research Consultants, Inc.*, 414 Pa. 253, 199 A.2d 428 (1964). "It requires but little appreciation . . . of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail in every facet of the securities industry." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186-87 (1963) (ellipsis in *Capital Gains,* internal quotation marks omitted). Thus, section 410 of the USA "was intended to reverse the age-old concept of caveat emptor and replace it with the concept of caveat venditor or seller beware." Joseph C. Long, 12A Blue Sky Law § 9:24 at 9-38 (2003) *quoted in Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 51-52, 809 N.E.2d 1017, 1026 (2004). The USA "is designed to induce sellers to be assiduous in insuring full disclosure to the buyer by threatening the seller with liability almost as an insurer in the event that there has been any material inaccurate disclosure or nondisclosure in the sale traceable in any way to the seller's carelessness or affirmative wrongdoing." *Marram*, 442 Mass. at 51.

14

Moreover, the civil liabilities section of the USA is a "virtual copy of the original § 12(2) of the Securities Act of 1933."[9] Joseph C. Long, 12A Blue Sky Law, § 9:23 (2008) (hereinafter "Long"). The Securities Act of 1933, 15 U.S.C. §§ 77a et seq., creates criminal and civil liability for securities-related infractions. *See Marram*, 442 Mass. at 50. Maryland courts frequently use federal case law to interpret similarly worded state securities laws in the absence of binding state court decisions. *Moseman v. VanLeer,* 263 F.3d 129, 133 (4th Cir. 2001) *cert. denied,* 534 U.S. 1128 (2002); *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md. App. 145, 620 A.2d 356, 369-70 (Md. 1993). Thus, I find that it is appropriate to consider cases interpreting state laws modeled on the USA as well as cases interpreting §12(2) of the Securities Act of 1933 when construing § 11-703 of the MSA.

A. *Four elements required to establish civil liability under § 410(a)(2) of the USA*

In order to establish a prima facie case under § 410(a)(2), a plaintiff must allege and prove that (1) the defendant offered or sold a security, (2) in the state in which the plaintiff filed

---

[9]The operative language (italicized below) of the federal securities act is nearly identical to that of the MSA:

Any person who
(**1**) offers or sells a security in violation of section 77(e) of this title, or
(**2**) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, *which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him.*

15 U.S.C. § 77(l).

15

suit, (3) there was a material misrepresentation or omission in connection with that offer or sale, and (4) the plaintiff did not know of the untruth or omissions. *See Sherwood Brands, Inc. v. Levie*, 2006 WL 827371, *12 (D. Md. 2006) (applying the MSA); *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 687-88 (3d Cir. 1991). Once the plaintiff has proven these four elements, the defendant may escape civil liability only if he can prove that he did not know and could not reasonably have known of the misrepresentation or omission at the time of the offer or sale. I will discuss each element of Little's case and Debtor's affirmative defense in turn.

### 1. Offer or sale of a security

Under the MSA, an "'offer' or 'offer to sell' . . . includes every attempt or offer to dispose of or solicitation of an offer to buy, a security or interest in a security for value." Md. Code, Corps. & Ass'ns. § 11-101(m). Similarly, a "sale . . . includes every contract of sale of, contract to sell, or disposition of a security or interest in a security for value." Md. Code, Corps. & Ass'ns. § 11-101(p). An offer to sell a security can occur in the form of an "agreement to reach an agreement" to purchase stock (*People v. Jacques*, 291 P.2d 124 (1955)); the issuance of a sales brochure for a proposed mutual fund (*Securities Exchange Commission v. Thomas D. Kienlen Corp.*, 755 F. Supp. 941 (D. Or. 1991)); or even a press conference to announce a public offering of stock (*SEC v. Arvida Corp.*, 169 F. Supp. 211 (S.D. N.Y. 1991)).

In the instant case, there can be no real dispute that, at least initially, an offer to sell a security was made by Debtor to Little. The documents and testimony leave no doubt that if the details could have been worked out, Debtor planned to transfer 51% of its outstanding shares to Little in exchange for $1.2 million. While the record does not provide an exact date on which a definitive offer was extended, Keith's testimony indicates that in early 2007, Debtor was actively

16

engaged in an effort to find an investor to purchase its stock, and it was through that effort that the parties began to negotiate the sale of stock now at issue. As I will discuss later, Little's payments toward the full purchase price were not unconditional acceptances of the offer to sell, but were conditioned upon the successful negotiation of operating and employment agreements.[10]

Little transferred cash to Debtor in anticipation of purchasing a majority interest in the business, but the transaction was subject to the parties finalizing other agreements ancillary to the sale. When Little terminated the sale before it was fully consummated, Debtor attempted to complete the transaction by sending a share certificate transferring a minority interest in Debtor, with a pledge to remit the shares bargained for once the full purchase price was paid.

### 2. In the state in which the plaintiff filed suit

In pertinent part, MSA § 11-801(a) states that § 11-703 applies "to any person who sells or offers to sell [securities] if the offer to sell is made in this State[] or the offer to buy is made and accepted in this State . . . ." MD Code Ann., Corps. & Ass'ns § 11-801(a)(1). Section 11-801(c) further explains that "an offer to sell is made in this State, whether or not either party is then present in this State, if the offer . . . is directed by the offeror to this State and received at the place to which it is directed . . . ." MD Code Ann., Corps. & Ass'ns § 11-801(c).

_____

[10]It is difficult to determine whether Debtor's issuance of a stock certificate in Little's name in order to force his hand effectuated a fully consummated "sale" of the securities under the MSA. Such circumstances are quite unique, and I have found no cases to guide me regarding whether the term "sale" as used in the MSA is appropriately applied to the within transaction. It would seem counterintuitive to conclude that a statute intended to protect purchasers who voluntarily accept securities in exchange for value would somehow not protect a purchaser who received the same securities by force or coercion. But as discussed above, I do not need to reach a conclusion regarding this issue because it is clear that an offer to sell was made by Debtor.

17

Little filed suit in the Maryland District Court. He lived in Maryland and conducted business there when Debtor made the offer to sell its stock. Negotiations leading up to the offer apparently took place in both Maryland and Pennsylvania. The testimony is not precise regarding the number of meetings that took place in Maryland, but Keith indicated that he met on at least a few occasions with Little at a restaurant or country club in Maryland to discuss the sale. Cases involving interstate sales of securities indicate that protracted negotiations over a single transaction between residents of two states may constitute an offer and sale in either state. *See Shappley v. State*, 520 S.W.2d 766 (Tex. Cr. App. 1975) (telephone conversation between salesman in Arizona and securities buyer in Texas amounted to an "offer" to a person within Texas; fact that sale was to be finalized in Arizona was immaterial); *State v. West*, 29 N.J. 327, 149 A.2d 217 (1959) (securities offered in telephone conversation between seller in New Jersey and buyer in New York prosecuted under New Jersey law although stock certificates accepted by buyer in New York). The Defendants do not dispute, and I conclude, that the securities in this case were offered for sale in Maryland.

3. *A material misrepresentation or omission made in connection with the sale*

Little alleges that Debtor made material misrepresentations and intentionally omitted material information in connection with the sale of securities. Omissions as well as misrepresentations must be material to be actionable. *SEC v. Pirate Investor LLC*, 580 F.3d 233, 240 (4th Cir. 2009) (citing *Longman v. Food Lion, Inc.,* 197 F.3d 675, 683 (4th Cir. 1999)). *See also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

18

*a.  When is a misrepresentation or omission "material"?*

The Supreme Court of Maryland has not yet interpreted the term "material" for purposes of the MSA.  In diversity cases, if there is no binding decision by the highest state court, it is the responsibility of a federal court to determine how it believes the highest state court would rule on a particular issue. *Commonwealth of Pennsylvania v. Brown*, 373 F.2d 771, 777 (3d Cir. 1967). Accordingly, a federal court reviewing a state statute "must forecast the position the supreme court of the forum would take on the issue." *Clark v. Modern Group Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993). In developing this forecast, decisions of state intermediate appellate courts are not binding, but should be given significant weight unless there is an indication that the highest state court would rule differently.  *City of Philadelphia v. Lead Industries Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993).  "Although we are not bound in a diversity case to follow decisions of a state intermediate appellate court, ... such decisions are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Jewelcor Inc. v. Karfunkel*, 517 F.3d 672, 676 (3d Cir. 2008)(citing *Northern Insurance Co. of New York v. Aardvark Associates, Inc.*, 942 F.2d 189, 193 (3d Cir.1991)).  "In attempting to predict state law, a federal court may 'consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data. . . .'" *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 612 (8th Cir. 2009)(citing *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980)). It is the duty of a federal court to ascertain and apply state law, not "to formulate new law based on our own notions of what is the better rule." *Leonard*, 553 F.3d at 612 (citing *McKenna*, 622 F.2d at 663).

19

I have located only one Maryland state court that has defined the meaning of "material" in the specific context of MSA § 11-703. In deciding the case, the Maryland Court of Special Appeals held that "[a] fact is deemed 'material' when it induces a party to enter into a contract or transaction." *Maryland Securities Com'r v. U.S. Securities Corp.* 122 Md. App. 574, 596, 716 A.2d 290, 301 (1998) (citing *Wegefarth v. Wiessner,* 134 Md. 555, 568, 107 A. 364 (1919); *Boulden v. Stilwell,* 100 Md. 543, 552, 60 A. 609 (1905)).[11] In *U.S. Securities,* the Special Appeals Court held that "[w]hen there is a duty to disclose material facts, a non-disclosed fact should be deemed material only if knowledge of that fact would have caused the party to act differently or somehow change his or her position." *Id.* Thus, the test adopted in *U.S. Securities* does not ask whether the reasonable investor would have considered the information in making his investment decision, but rather whether the particular investor involved in the case would have changed his mind if the misrepresentation had not been made or the omitted fact had been disclosed. A majority of courts have rejected this approach.

In *TSC Industries, Inc. v. Northway, Inc.*, *supra*, an offeror omitted information from a proxy statement issued to shareholders in violation of § 14 of the Securities Exchange Act of 1934. The Supreme Court held that "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries*, 426 U.S. at 449. The *TSC Industries* definition has been extended to apply to "materiality" in the context of a sale of securities under § 12(2) of the Securities Act of 1933, *supra*. *See Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 641, fn. 18 (3d Cir. 1989)

---

[11]Notably, in both *Wegeforth* and *Boulden*, the Maryland Supreme Court was not defining "material"in the context of interpreting the Maryland Securities Act. In fact, one of those decisions, *Boulden*, pre-dates the seminal Maryland Securities Act by more than fifty years.

20

(citing *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 731 (2d Cir. 1987) *cert. denied*, 485

U.S. 1007 (1988)); *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916, 919-20 (8th

Cir. 1977).

The *TSC Industries* definition of materiality also has been adopted by courts construing

state statutes patterned on the USA.

> A misstatement or omitted fact is material if there is a substantial likelihood that a
> reasonable purchaser or seller would consider it important in deciding whether or
> not to purchase or sell. It does not require proof of a substantial likelihood that
> disclosure of the misstatement or omitted fact would have caused the reasonable
> investor not to purchase or sell the security. What the standard does contemplate

is a showing of a substantial likelihood that, under all the circumstances, the misstatement or
omitted fact would have assumed actual significance in the deliberations of the reasonable
investor.

*Green v. Green*, 293 S.W.3d 493, 512 -13 (Tenn. 2009) (citing Long at § 10.44). *See also Rose*

*v. Dobras,* 128 Ariz. 209, 624 P.2d 887, 892 (Ariz. Ct. App. 1981); *Goss v. Clutch Exch., Inc.,*

701 P.2d 33, 36 (Colo. 1985); *Carroll v. J.J.B. Hilliard, W.L. Lyons, Inc.,* 738 N.E.2d 1069, 1077

(Ind. App. 2000); *State v. Puckett,* 6 Kan. App.2d 688, 634 P.2d 144, 149 (1981); *Marram v.*

*Kobrick Offshore Fund, Ltd. supra*; *Bridwell v. State,* 2008 WL 467271, at *5 (Tex. Ct. App.

2008); *Carcano v. JBSS, LLC*, 684 S.E. 2d 41 (N.C. App. 2009); *Cuene v. Hillard*, 312 Wis. 2d

506, 754 N.W. 2d 509, 514 (2008); *Guarino v. Interactive Objects, Inc.*, 122 Wash. App. 95,

114, 86 P.3d 1175, 1185 (2004); *Blackmon v. Nexity Financial Corp.*, 953 So. 2d 1180, 1191 -

92 (Ala. 2006); *Lehn v. Dailey*, 77 Conn. App. 621, 628-629, 825 A.2d 140, 145 (2003); *Manns*

*v. Skolnik*, 666 N.E. 2d 1236, 1249, fn. 8 (Ind. App. 1996); *Hubbard v. Hibbard Brown & Co.*,

633 A.2d 345, 352 (Del. 1993); *C&C Elec. Const. Co., Inc. v. Rogers*, 281 Ark. 178, 663 S.W.

2d 707 (1984).

21

State courts addressing the issue since *TSC Industries* generally have adopted the objective test for materiality. Long, at § 9:23. Thus, state courts considering the "materiality" of a statement or omission under state law provisions derived from § 410(a)(2) of the USA, and which include the same elements as the Maryland statute, have applied the Supreme Court's reasoning in *TSC Industries*. These courts have found that a misrepresentation or omission is material if there is substantial likelihood that a reasonable purchaser or seller would consider it important in deciding whether or not to purchase or sell. Therefore, I find that if faced with the same issue, the Maryland Supreme Court would depart from the intermediate state court's decision in *U.S. Securities Corp*. and apply the reasoning of *TSC Industries* to MSA § 11-703(a)(1)(ii). Accordingly, for the purpose of imposing civil liability on a seller of securities, a misrepresentation or omission is material if there is a substantial likelihood that a reasonable purchaser would consider the information to be important in deciding whether to purchase a particular security.

This position is bolstered by my reading of the Court of Appeals' ruling in *Shulton, Inc. v. Rubin*, 239 Md. 669, 686-87, 212 A.2d 476 (1964). In this case, the Court observed that § 12(2) of the Securities Act of 1933 and § 11-703(a)(1)(ii) of the MSA (previously codified at Md. Ann. Code art. 32A, § 34(a)(2) (Supp.1964)) are "substantially the same provisions." *Id.* Having found these provisions to substantially similar, I predict that the Maryland Court of Appeals would find the reasoning of the courts of appeals for the Third and Eighth Circuits to be persuasive and would apply the *TSA Industries* definition of materiality in the context of MSA § 11-703(a)(1)(ii). See *Craftmatic Securities Litigation*, 890 F.2d at 641, fn. 18; *Alton Box Board Co.*, 560 F.2d at 919-20, *supra*.

22

*b. Material misrepresentations or omissions in this case*

In his case in chief, Little focused on the Debtor's failure to provide monthly operating reports that he had specifically requested during the early months of the negotiation process. Little testified that at a meeting on June 28, 2007 he specifically asked Keith to provide him with Debtor's monthly financial reports. Keith's notes taken at that meeting confirm Little's testimony. (Little Ex. 3, Bates No. 19.) In testimony elicited by Little's counsel, Keith confirmed that Little requested this information at the June 28 meeting and that Keith agreed to provide it.[12] (7/1 N.T. 20 -21.) More significant, Keith unequivocally agreed that it would have been "important" for Little to have had that information to review in making his decision to purchase stock. (7/1 N.T. 21.) While I am not persuaded that the mere failure to produce the documents constituted a "material omission" for purposes of MSA § 11-703(a)(1)(ii), I am convinced that the information contained in those documents, especially the information revealing the depth of Debtor's long-term financial woes, was material to Little's investment decision in light of the misleading nature of other more positive information and projections that Keith previously had provided to Little.

At a meeting in Hunt Valley, Maryland on March 7, 2007, Debtor provided Little with a memo on the subject of "Investment Into Ressler Hardwoods and Flooring, Inc." that contained certain factual data and some positive predictions regarding projected sales for 2007. The memo included the following: (1) representations that Debtor had been quoting $1 to $2 million in orders per month; (2) that the business had a current backlog of orders that would produce

---

[12]Later, without explanation, Keith contradicted his earlier testimony and denied ever having agreed to produce Debtor's monthly financial statements for Little. I find his self-serving denials to be without credibility in light of his earlier, unequivocal testimony to the contrary.

revenues of $473,000.00 with a profit margin of 10%; (3) that in April 2007, Debtor would

begin supplying two new distributors who would purchase $220,000.00 per month in materials;

(4) that Debtor had a contract to supply 200,000 square feet of walnut flooring over eighteen

months commencing in April 2007; (5) that Debtor was projecting sales of $325,000.00 per

month for 2007; and (6) that the working "assumption is that we will exceed our projection."

(Debtor Ex. 3, Bates No. 10.) Debtor's predictions for its future growth were buttressed with

information provided to Little at a meeting on June 7, 2007. A printed agenda[13] for that meeting

contains statements regarding current sales to flooring distributors in Utah, Colorado and New

York along with predictions of substantial increases in sales to these customers in the near term.

(Little Ex. 3, Bates No. 14.) Like the March 7, 2007 memo, this document contains no negative

statements or cautionary disclaimers regarding Debtor's projected sales or ongoing financial

difficulties. Little argues that the entirely positive representations made in these communications

were misleading in light of Debtor's failure to produce its monthly financial data as he had

requested on June 28, 2007.

Debtor's monthly financial statements for January 2006 to December 2008 are part of the

record. For purposes of the instant inquiry, only that information that would have been available

to Little prior to the date on which he made his investment decision is relevant. Making a

finding regarding the date on which Little's "investment decision" was made is somewhat

complicated by the fact that Little never accepted the transfer of the 26,021 shares of stock from

Debtor. Nonetheless, he held possession of a stock certificate made out in his name for those

---

[13]The document bears the title "Minutes for meeting," which would imply that it was
prepared after the meeting was held, but its content indicates that it was in fact prepared prior to
the meeting.

24

shares. The certificate was transferred to him in consideration for the $400,000.00 transferred to the Debtor in July 2007. Because this transfer of stock occurred in exchange for valuable consideration, I find that the date on which title to that stock passed to Little and, therefore, the date on which he effectively made his "investment decision," was the date in July 2007 when he tendered the first $200,000.00 payment. Therefore, I will examine the monthly financial statements that Debtor provided for the period between January 2006 and June 2007, inclusive.

Debtor's monthly financial statements for the calendar year 2006 and the first six months of 2007, along with other documents reflecting Debtor's month-to-month income and expenses, were provided to Little for the first time at the trial of this matter on July 1, 2009. (7/1/09 N.T. 29.) These documents provide information on Debtor's revenues, costs of sale, gross profits, expenses and net monthly income for several months during the relevant time period, which are set out in the Table below.

| Date | Total revenue | Total costs of sale | Gross profit | Total expenses | Net monthly income |
|------|--------------|---------------------|--------------|----------------|--------------------|
| Jan. 06 | $29,447.45 | $19,709.59 | $9,737.86 | $30,117.70 | ($20,379.84) |
| Feb. 06 | $33,267.66 | $30,972.16 | $2,295.50 | $109,367.79 | ($107,072.29) |
| Mar. 06 | $27,850.86 | $27,329.10 | $521.76 | $60,763.62 | ($60,241.86) |
| April 06 | $8,851.13 | $10,470.55 | ($1,619.42) | $43,000.77 | ($44,620.19) |
| May 06 | $3,275.04 | $12,591.27 | ($9,316.23) | $62,610.39 | ($71,926.62) |
| June 06 | $35,873.20 | $59,633.51 | ($23,760.31) | $61,776.82 | ($85,537.13) |
| July 06 | 0 | 0 | 0 | 0 | 0 |
| Aug. 06 | 0 | 0 | 0 | 0 | 0 |
| Sept. 06 | 0 | 0 | 0 | 0 | 0 |

| Date | Total revenue | Total costs of sale | Gross profit | Total expenses | Net monthly income |
|---|---|---|---|---|---|
| Oct. 06 | 0 | 0 | 0 | 0 | 0 |
| Nov. 06 | 0 | 0 | 0 | 0 | 0 |
| Dec. 06 | 0 | 0 | 0 | 0 | 0 |
| Jan. 07 | $115,808.13 | $100,948.69 | $14,859.44 | $19,214.00 | ($4,354.56) |
| Feb. 07 | $58,359.47 | $56,448.10 | $1,911.37 | $31,713.22 | ($29,801.85) |
| Mar. 07 | $123,371.52 | $98,247.03 | $25,124.49 | $44,931.57 | ($19,807.08) |
| April 07 | $130,240.59 | $109,626.03 | $20,614.56 | $53,362.72 | ($32,748.16) |
| May 07 | $183,860.35 | $126,901.20 | $56,959.15 | $55,905.23 | $1,053.92 |
| June 07 | $146,156.86 | $131,231.54 | $14,925.32 | $61,469.16 | ($46,543.84) |
| **TOTALS** | **$896,362.26** | **$784,108.77** | **$112,253.49** | **$634,232.99** | **($521,979.50)** |

To summarize the contents of the Table, Debtor's monthly financial statements for the eighteen months that preceded Little's transfer of funds toward the purchase of Debtor's stock show total losses for the period of more than $521,980.00 on revenues of $896,362.00. In all but one month for which a report is filed, Debtor operated at a loss. During the second half of 2006 Debtor had no revenue whatsoever. In its single profitable month (May 2007), Debtor had net monthly income of slightly more than $1,000.00. This one month of profitability, however, was followed by another month in which the company operated at a loss.[14]

In light of Keith's March 2007 projections, I find that the information contained in Debtor's monthly financial statement were material to the "investment decision" that Little made in July 2007. Provided with the March 7 projections, but with no information on Debtor's actual

_____

[14]The relevant time period for purposes of this case ended in June 2007. Debtor continued to incur losses in the tens of thousands of dollars each month through the remainder of that year.

26

performance, Little was deprived of the ability to make an intelligent and informed decision about the purchase of Debtor's stock. More generally, there was a substantial likelihood that a reasonable purchaser would consider the information in the omitted financial statements to be important in deciding whether to purchase 51% of Debtor's stock.

### 4. *Little did not know of the misrepresentation or omission at the time of the offer*

In their briefs, the Defendants argue forcefully that Little effectively waived any right to assert that the monthly financials were material when, without having received the monthly financials, he deposited $800,000.00 into an escrow account before he left for Israel. This argument rings hollow. The balance of the funds to complete the sale was deposited in escrow, not transferred to Debtor. All parties understood that as of November 1, 2007, there were contingencies that had not been resolved before the purchase could be finalized. As discussed above, the test is not whether Little would have been willing to complete the transaction without the information, but rather was there a substantial likelihood that a reasonable purchaser would consider the information to be important before purchasing the stock. Debtor's business prospects would have appeared in a different light if the monthly financial statements had been made available to Little at the same time he received Keith's projections of future sales and earnings. Further, Little's actions in early November 2007 are not relevant to a determination as to whether the *offer* was misleading because the offer was accepted in July, months before the balance of the purchase price was placed in escrow.

Having examined each of the factors that must be proven in order for a plaintiff to establish civil liability under MSA § 11-703(a)(1)(ii), and having found that Little has produced sufficient evidence to carry his burden on each of those factors, I conclude that the Defendants

27

are civilly liable to him for damages under MSA §11-703(a)(1)(ii) unless they can show that they did not know, and in the exercise of reasonable care could not have known, of the omissions at the time they were made.

### B. *Defendants' affirmative defenses*

The MSA imposes joint and several liability for violations of § 11-701(a) on "every partner, officer, or director of the person liable" unless the partner, officer or director does not know or "in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Md. Ann., Corps. & Ass'ns § 11-703(c). Defendants' brief asserts that it was Little's burden to prove that the Resslers knew or should have known about the misleading omissions that Little alleges in his Complaint. A close examination of the sentence structure in the statute reveals that this assertion is incorrect. The drafters of the Maryland statute simply opted to explain that the buyer must not know of the misleading or omitted information by using a phrase separated from the rest of the sentence by commas rather than by adopting the style used in the USA, in which similar content was included in a parenthetical phrase. Although the sentence structures are different, the meaning in the two statutes is the same. A person who makes a misleading material statement or who omits material information has the burden of proving that he did not know of the untruth or omission or, in the exercise of reasonable care, could not have known of the untruth or omission.[15]

---

[15]*Compare*
A person is civilly liable to the person buying a security from him if he:

(ii) Offers or sells the security by means of any untrue statement of a material fact or any omission . . . , *the buyer not knowing of the untruth or omission*, and if he does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

MD Code Ann., Corps. & Ass'ns, § 11-703(a)(1)(ii) to

Any person who offers or sells a security by means of any untrue statement of

This construction of the statute is supported by cases from jurisdictions with securities laws based on the USA. This model law places on the defendant the burden to demonstrate that in the exercise of reasonable care, the defendant could not have known the untrue or omitted information. *See Wicks v. O'Connell*, 748 P.2d 551, 558 (1988); *Kronenberg v. Katz*, 872 A.2d 568, 599 (De. Ch. 2004); *Landry v. Thibaut*, 523 So. 2d 1370, 1380 (1988); *Bradley v. Hullander*, 272 S.C. 6, 22, 249 S.E. 2d 486, 494 (1978).

Decisions construing analogous provisions of the Securities Act of 1933 also support the allocation of the burden of proof on the seller. Like the USA, § 12(2) of the 1933 Act places on the seller of securities the burden of proving lack of knowledge of an untruth or omission of material information. *People v. Simon*, 886 P.2d 1271, 1283 (1995); *Hines v. Data Line Systems, Inc.*, 787 P.2d 8, 21 (1990).

Defendants have failed to sustain their burden of proof on this issue. Having argued that the burden was on Little to show that Defendants knew they were misrepresenting or omitting material facts or with reasonable care could have known of these facts, Defendants failed to sustain their burden as to their actions. Keith was the primary officer and director involved in the negotiations for the sale of Debtor's securities. Little asked Keith to provide him with the Debtor's monthly financial data, which he failed to produce before Little accepted the offer in July 2007. Keith does not dispute Little's testimony that the data was never produced. He does not attribute this failure to inadvertence or oversight.[16] Rather, Keith argues, incorrectly, that

---

a material fact or any omission . . . *(the buyer not knowing of the untruth or omission)*, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security him. . . .

Unif. Sec. Act (1956), § 410(a)(2) (emphasis added).

[16]"The plaintiff does not need to prove either negligence or scienter to meet his burden of proof [under USA § 410]. J.C. Long, Blue Sky Law, *supra* at § 9:23 at 9-34.1. . . . The buyer

Case 1:08-ap-00109-MDF    Doc 111    Filed 03/19/10    Entered 03/22/10 11:49:15    Desc
Main Document    Page 29 of 36

Little's knowledge of the Debtor's general financial difficulties made these omissions inconsequential. Because Debtor failed to fully disclose its financial condition by providing Little with the monthly financial reports, Keith is liable under MSA §11-703 for civil damages for having omitted information that was material to Little's investment decision. It was necessary for Little to receive the information in these reports to make Keith's prior representations about Debtor's financial condition not misleading.

Kenneth and Karen were not as involved as was Keith in the negotiations leading up to the offer to sell the shares to Little. However, they were both officers and participated in meetings of the board of directors. As discussed at length above, officers and directors of a corporation may be absolved of liability for failing to disclose material information only if they prove by a preponderance of the evidence that they did not know of or with reasonable care could not have known of the omissions. Kenneth and Karen failed to carry this burden. Kenneth acknowledged that he was aware of the ongoing negotiations between the parties and the issues that impeded a final agreement. He acknowledged having communicated on a fairly regular basis with Keith regarding the progress of negotiations. Kenneth was privy to summaries of meetings and conferences that he was not able to attend. In short, he did not show that he was prevented from learning what information had been provided to Little and what information had been withheld.

As secretary of the corporation, Karen participated in meetings held by the board of directors, including all of the formal meetings held in connection with the sale of securities to Little. In her capacity as an officer of the corporation, she executed the minutes of the meeting

---

needs only to show 'lack of knowledge of a misleading statement or omission in order to prevail.'" *Mid-America Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc.,* 886 F.2d 1249, 1254 (10th Cir. 1989). "All that is required is ignorance of the untruth or omission." *Marram,* 442 Mass. at 53-54, 809 N.E.2d at 1026 -27 (footnote and citations omitted).

on December 10, 2007 at which the board voted unanimously to issue stock to Little in lieu of returning his deposit money. (Little Ex. 32.) In addition to being an officer and director, Karen also was employed by Debtor as a bookkeeper/accountant and salesperson. Karen denied having ever met Little, but she admitted knowing that he was interested in investing in the company. She also generally knew that the funds Little advanced were intended as an investment in the company. However, she testified that she has great difficulty in the area of reading comprehension and that she frequently needed either Keith or Kenneth to explain a document to her. Although she was an officer and director, she stated that she only signed the minutes of the board meetings and the stock certificate after being instructed by her husband or son to do so. But neither Karen's lack of participation in the negotiations over the sale of securities nor her general lack of business acumen provide sufficient proof that she could not, in the exercise of reasonable care, have known that Little had been misled about Debtor's future business prospects and that he had been deprived of hard historical data that would have been important to his investment decision.[17]

---

[17]MSA § 11-703 differs from section 77 of the Securities Act of 1933 in its language regarding civil liability for corporate officers. The 1933 Act contains the following language:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77 *l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77(o). By this language, the 1933 Act places a burden on the plaintiff to show that the defendant exercised some degree of actual control over the seller's actions. *See Metge v. Baehler*, 762 F.2d 621, 630 (8th Cir. 1985). By unconditionally naming all corporate directors as being jointly and severally liable along with the actual seller, the MSA does not appear to place particular emphasis on the question of whether or not a given director was directly involved in making the offer to sell.

31

*C. Defendants' attempt to characterize funds paid by Little as a loan*

In one of the odder twists of this case, a few weeks after Little filed suit against the Defendants, Keith Ressler produced a letter ("Loan Letter") that purports to reflect Little's agreement that his cash advances on the purchase price of Debtor's stock were to be treated as a loan to the company. (Little Ex. 10). The Loan Letter is signed by Keith and addressed to Little. Keith testified that he had completely forgotten about the loan arrangement until he found the Loan Letter while preparing for a meeting with counsel after Little filed suit in the Maryland District Court.

Little testified that he never represented that he would treat the funds advanced as a loan. He conceded that during the early stages of the negotiations the parties discussed the possibility that part of the entire transaction might be treated as a loan for tax purposes, but he insisted that no agreement to this effect was reached. Little further asserted that he had not seen the Loan Letter until it was produced during the discovery phase of this litigation.

Keith's testimony about how the letter was discovered and the circumstances under which it was drafted is inconsistent. Keith first testified that he discovered the Loan Letter while searching through his virtual documents in his word processing files. Later, however, he stated that he first found a hard copy in a file folder and only then located the virtual copy. Keith first testified that he alone wrote the letter, but later in his testimony he stated that Kenneth had assisted him. For his part, Kenneth denied having helped to draft the letter, noting that he was "surprised" when Keith produced the letter at the January 2008 board meeting because he had never seen it before. (11/4/08 Deposition N.T. 20.) Others present at the meeting, including Musso, also were "shocked" to learn of the existence of the letter. (7/1/09 N.T. 134.) Considering the testimony at trial of Little, Keith and Musso and the testimony of Kenneth at his

deposition, I find Keith's assertions that he drafted the Loan Letter and sent it to Little not to be credible.

   D.  *Debtor's Counterclaim to compel enforcement of a contract*

   With a nod to the adage that the best defense is a good offense, Debtor strenuously argues that the Court should not only dismiss Little's complaint but also find that there was a final "agreement" to purchase 51% of Debtor's stock that should be enforced against Little.  Debtor cites the recent decision of the Court of Appeals for the Third Circuit, *American Eagle Outfitters v. Lyle & Scott, Ltd.*, 584 F.3d 575 (3d Cir. 2009), in support of its position.

   In *American Eagle Outfitters,* a clothing retailer sought a declaratory judgment that a purported agreement resolving a trademark dispute was binding and requested specific enforcement of the agreement. The District Court granted summary judgment in favor of the retailer. The Circuit Court affirmed the District Court in part, agreeing that the parties had formed an enforceable agreement to which they intended to be bound.  The Circuit Court also reversed the District Court in part and remanded the case finding that certain terms of the agreement were ambiguous and required interpretation by a jury.

   Debtor asserts that this Court should find the holding in *American Eagle Outfitters* to be on point and find that the agreement between Debtor and Little to purchase 51% of Debtor's shares to be a final contract.  I disagree. The agreement in *American Eagle Outfitters,* which consisted of ten provisions set out in "bullet points" describing the parties' respective use of an eagle emblem in their businesses,  had been reduced to writing at a joint meeting of the parties' agents.[18]  The agents discussed signing the agreement at the meeting, but decided that the bullet points should be included in an agreement formalized by corporate counsel before it was

---

[18]The dispute between the parties arose when Lyle & Scott, a British sportswear manufacturer, sent a letter to American Eagle Outfitters regarding the latter's use of an eagle emblem that Lyle & Scott asserted infringed on its trademark.

Case 1:08-ap-00109-MDF    Doc 111    Filed 03/19/10    Entered 03/22/10 11:49:15    Desc
Main Document    Page 33 of 36

executed. One of the bullet points allowed American Eagle to "register its eagle design marks for goods and services throughout the world." In drafting its version of the agreement, Lyle & Scott altered this language to change the words "throughout the world" to "in the U.S." American Eagle was not willing to limit itself to domestic use of its eagle emblem and refused to execute the agreement. When Lyle & Scott refused to change its proposed language back to that contained in the bullet points, litigation ensued.

Debtor asserts that the terms reached by the parties at their October 15, 2007 meeting were, like the terms reached at the meeting in the *American Eagle Outfitters* case, understood by both parties to be the material elements of a final agreement that needed only to be formalized by counsel before it could be executed. Debtor favorably compares the bullet point agreement in *American Eagle Outfitters* to Musso's email of October 17, 2007 that summarized his notes from the October 15 meeting. For a number of reasons, the facts of *American Eagle Outfitters* and the instant case are distinguishable.

First, there is no evidence that during the October 15 telephone conference, Little agreed that Musso would draft an interim operational agreement based upon prior discussions between the parties. Even if Little had agreed that Musso would draft an interim contract, there is no evidence that Little agreed that his failure to respond to Musso's email could be regarded as implied consent to the terms. Thus, the within facts are dissimilar to the facts of *American Eagle Outfitters* in which the parties met, jointly drafted an agreement, immediately made copies for themselves, but did not formally execute the agreement. Little's "virtual" silence in response to Musso's email cannot bind him to the terms of Musso's unilaterally-drafted document when there is no evidence that Little had agreed that his silence could be understood as assent.

Second, as the Third Circuit found, the bullet points of the *American Eagle Outfitters* agreement set forth terms sufficiently specific to show that there had been a meeting of the minds

Case 1:08-ap-00109-MDF    Doc 111    Filed 03/19/10    Entered 03/22/10 11:49:15    Desc
Main Document    Page 34 of 36

between the parties. The only contingency was the need to reduce the terms to a formal written document that would be signed by the parties. In the instant case, the parties agreed that Little would purchase and that Debtor would sell 51% of Debtor's stock *if* the parties could negotiate operating and employment agreements acceptable to both sides. The only obligation to which the parties bound themselves was the obligation to negotiate in good faith. Thus, the unsigned agreement in *American Eagle Outfitters* differs substantially from the parties' "agreement to reach an agreement" in this case.

Finally, the actions of the defendant in *American Eagle Outfitters* differs significantly from those of Little in the within case. In the *American Eagle Outfitters* case, Lyle & Scott reneged on the agreement reached by the parties after American Eagle Outfitters refused to agree to unilateral modifications to the agreement made by Lyle & Scott. The Court of Appeals affirmed the lower court's conclusion that American Eagle Outfitters was not bound to accept these unilateral changes to the agreement without additional consideration from Lyle & Scott. In this case, Little negotiated the agreement to purchase 51% of Debtor's stock in good faith until he learned that Debtor had begun negotiations with another party. Although there may have been an agreement to purchase Debtor's shares, finalization of the sale was contingent upon the parties reaching a final agreement on the operation of the business and the employment of the Resslers.

### V. Conclusion

The funds paid by Little were intended as an advance on the purchase of 51% of Debtor's shares contingent upon the successful negotiation of operating and employment agreements. An agreement for Debtor to sell and for Little to purchase a majority interest in Debtor was never finalized, and the funds advanced in anticipation of a final sales agreement were not a loan.

Debtor, in connection with an offer to sell securities, provided information on its business, including earnings projections for 2007, that were misleading because the information

did not include material facts necessary to make those projections not misleading. Specifically, Debtor failed to provide historical monthly financial information that had been requested by Little, who was unaware at the time the offer was made that the omitted information would demonstrate that prior information about Debtor was misleading. Because of these omissions, Debtor is civilly liable to Little under MSA § 11-703(a)(1)(ii). Further, each Defendants is jointly and severally liable to Little under the provisions of MSA § 11-703(c).

An appropriate order will be entered.

**By the Court,**

Mary D France
Chief Bankruptcy Judge

Date: March 19, 2010

*This document is electronically signed and filed on the same date.*